# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

LEHMAN BROTHERS HOLDINGS INC.,

     Plaintiff,

    vs.

GATEWAY FUNDING DIVERSIFIED
MORTGAGE SERVICES, L.P.

     Defendant.

CIVIL ACTION NO. 2:11-cv-06089-AB

## ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court upon Plaintiff Lehman Brothers Holdings Inc.'s ("LBHI") motion for summary judgment pursuant to Fed. R. Civ. P. 56 against Defendant Gateway Funding Diversified Mortgage Services, L.P. ("Gateway"). All premises considered, the Court **GRANTS** the motion as follows:

1.     The undisputed facts establish that Arlington Capital Mortgage Company owes a debt to LBHI in the amount of $713,261.05, plus fees and costs;

2.     The undisputed facts establish that Gateway is the successor to Arlington Capital Mortgage Company as a result of the companies' *de facto* merger, and its liable for the debt owed to LBHI.

Accordingly, judgment shall be entered against Gateway in favor of LBHI in the amount of $713,261.05, plus fees and costs to be determined pursuant to Fed R. Civ. P. 54(d)(2).

SO ORDERED.

Dated: _____

_____
Honorable Anita B. Brody
District Court Judge

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

LEHMAN BROTHERS HOLDINGS INC.,

        Plaintiff,

    vs.

GATEWAY FUNDING DIVERSIFIED
MORTGAGE SERVICES, L.P.

        Defendant.

CIVIL ACTION NO. 2:11-cv-06089-AB

## PLAINTIFF LEHMAN BROTHERS HOLDINGS INC.'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Lehman Brothers Holdings, Inc., by and through its attorneys, Fulbright & Jaworski, L.L.P. and Antheil Maslow & MacMinn, LLP, hereby moves this Honorable Court for an Order entering summary judgment in its favor and against Defendant Gateway Funding Diversified Mortgage Services, L.P., and in support thereof, relies upon the accompanying Memorandum of Law, Declarations and Exhibits thereto.

FULBRIGHT & JAWORSKI L.L.P

By:      s/ Matthew D. Spohn
        Matthew D. Spohn (*pro hac vice*)
        Tabor Center
        1200 17th Street, Suite 1000
        Denver, CO 80202-5835
        Phone:  303-801-2760
        Fax:    303-801-2777
        Email:  mspohn@fulbright.com

        and

ANTHEIL MASLOW & MACMINN, LLP

By:      s/ Thomas P. Donnelly
        Thomas P. Donnelly, Esq. #69590
        131 W. State Street
        Doylestown, PA 18901
        Tel:  215-230-7500
        Fax:  215-230-7796
        Email:  tdonnelly@ammlaw.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

LEHMAN BROTHERS HOLDINGS INC.,

     Plaintiff,

  vs.

GATEWAY FUNDING DIVERSIFIED
MORTGAGE SERVICES, L.P.

     Defendant.

CIVIL ACTION NO. 2:11-cv-06089-AB

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff Lehman Brothers Holdings Inc. ("LBHI"), by and through its undersigned attorneys, hereby submits this brief in support of its motion for summary judgment pursuant to Fed. R. Civ. P. 56 against Defendant Gateway Funding Diversified Mortgage Services, L.P. ("Gateway").

## INTRODUCTION

This case presents the very fact pattern that led to the creation of the *de facto* merger theory of successor liability. For all intents and purposes Arlington Capital Mortgage Corporation ("Arlington") sold its shares to Gateway and was merged into it: Gateway paid Arlington's owners for their ownership interests in a combination of cash payments, forgivable loans, and new obligations; all of Arlington's assets were transferred to Gateway; Gateway assumed substantially all of Arlington's liabilities and contracts; substantially all of Arlington's employees were transferred to Gateway; Arlington's owners became managers of Gateway, overseeing the same employees they had overseen at Arlington, at the same branch locations that

1

continued to use the Arlington name; and Gateway continued Arlington's prior business operations in the same markets.  However, in a naked attempt to avoid Arlington's debts the companies simply titled the transaction an asset purchase and Arlington's stock did not formally transfer to Gateway, even though Gateway had paid for it.   Now, when LBHI seeks payment for debts Arlington owed for selling loans that did not live up to their promised quality, Gateway argues that it has nothing to do with Arlington and cannot be held responsible.

That is not the law, nor should it be.  Because the undisputed facts establish that (1) Gateway is liable for Arlington's debts as a result of the companies' *de facto* merger and (2) LBHI's claim is one of the debts for which Gateway is responsible, LBHI seeks summary judgment in its favor.

## STATEMENT OF UNDISPUTED FACTS

1.     Arlington was a mortgage origination company that originated loans that it funded or brokered.  Russo Depo.[1] 14:5-10, Granahan Depo. 12:21-13:6.  It then sold those loans to buyers, known as "investors" in the mortgage industry.  Russo Depo. 30:10-31:4.

2.     Arlington entered into a Loan Purchase Agreement (the "Agreement") with Lehman Brothers Bank, FSB ("LBB") dated August 16, 2001 and subsequently amended on November 20, 2006, which incorporates the Aurora Seller's Guide ("Seller's Guide") and governs LBB's purchase of loans from Arlington.  Declaration of John Baker ("Baker Decl.") ¶ 2-3 & Exs. A & B).

3.     Arlington sold Loans ****2680 (Pimentel), ****2672 (Pimentel), ****2995 (Steinhouse), and ****3522 (McNair) (hereinafter, the "Arlington Loans") to LBB pursuant to

---

[1] The depositions of Bruno Pasceri, Phillip Russo, Daniel Leinhauser, Joseph Granahan, and Kevin Kenyon are attached as Exhibits A through E to the Declaration of Matthew Spohn submitted herewith.

the Agreement, and LBB paid for them.  Baker Decl. ¶ 4 & Ex. D.

4.     LBB has assigned to LBHI all of LBB's rights in and to its Agreement with Arlington with respect to the Arlington Loans, including all rights in and to any and all representations, warranties or covenants made by Arlington in the Agreement and Seller's Guide and all rights to repurchase and indemnity remedies, among other things.  Baker Decl. ¶ 7 & Ex. C.

## I.     Arlington's Liability On The McNair Loan

5.     Arlington sold Loan ****3522 (McNair) to LBB subject to its representation and warranty that:

> No document, report or material furnished to Purchaser in any Mortgage Loan File or related to any Mortgage Loan (including, without limitation, the Mortgager's application for the Mortgage Loan executed by the Mortgagor), was falsified or contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading.

Baker Decl. Ex. B at § 703(1).

6.     Arlington's agreement with LBB provides that loans were purchased from Arlington "in reliance upon (1) the truth and accuracy of Seller's representations and warranties set forth in the Loan Purchase Agreement and this Seller's Guide, each of which representations and warranties relates to a matter material to such purpose...."  Baker Decl. Ex. B at § 701.

7.     Arlington's agreement with LBB provides:

> In the event of a breach of any of the representations, warranties or covenants contained in *Section 700* through *710*  herein, which breach materially and adversely affects the value of the Mortgage Loans or the interest of Purchaser, or materially and adversely affects the interest of Purchaser in the related Mortgage Loan, and unless Purchaser determines that such breach has been cured ... Seller shall, at Purchaser's option, repurchase the related Mortgage Loan ... at the Repurchase Price.

Baker Decl. Ex. B at § 710.

8.     Arlington's agreement with LBB contains the following indemnification provision:

> In addition to any repurchase and cure obligations of Seller, . . . Seller shall indemnify Purchaser and Purchaser's designee . . . from and hold them harmless against all claims, losses, damages, penalties, fines, claims forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Purchaser may sustain in any way related to or resulting from any act or failure to act or any breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Seller's Guide or the Loan Purchase Agreement by any agent, employee, representative or officer of Seller or Seller's correspondent

Baker Decl. Ex. B at § 711.

9.     The borrower's application for Loan ****3522 (McNair) that was transmitted to LBB's agent Aurora Loan Services LLC ("Aurora") in connection with the sale of the loan contained material misrepresentations.   Specifically, the application represented that the borrower's mortgage debt on a property at 1827 D Street NE, Washington, D.C. was $158,471 when it was actually $328,800, represented that the borrower's monthly payment on that debt was $1,360 when it was actually $2,603.  Baker Decl. ¶¶ 9-10 & Exs. E-F.

10.     The misrepresentation on the application for Loan ****3522 (McNair) was material, and had a material and adverse effect on the value of a loan and the interests of LBB and LBHI.  Baker Decl. ¶ 11.

11.     LBHI notified Arlington that Arlington had breached its representations and warranties in the Agreement and demanded repurchase of Loan ****3522 (McNair) by a letter dated August 26, 2009.  Arlington did not repurchase Loan ****3522 (McNair) within 30 days of written notice and demand.  Baker Decl. ¶¶ 12-13 & Ex. G.

## II.     Arlington's Liability On The Pimentel and Steinhouse Loans

12.     Arlington executed Indemnification Agreements with LBB in which Arlington agreed to provide indemnity for all losses, damages, costs, fees, etc. suffered on Loans

4

****2680 (Pimentel), ****2672 (Pimentel), and ****2995 (Steinhouse) within 30 days of written demand.  Baker Decl. ¶ 14 & Ex. H.

13.     These Indemnification Agreements were each validly assigned to LBHI by LBB and Aurora.  Baker Decl. ¶ 15 & Ex. I.

14.     On May 9, 2011, Aurora demanded that Arlington provide LBHI with indemnity for its losses on Loans ****2680 (Pimentel), ****2672 (Pimentel), ****2995 (Steinhouse), but Arlington did not indemnify LBHI for its losses on those loans within 30 days of written notice and demand.  Baker Decl. ¶¶ 16-17 & Ex. J.

**III.   LBHI's Damages On The McNair, Pimentel, and Steinhouse Loans**

15.     Section 8 of the Seller's Guide, in its definition of "Repurchase Price," sets forth a formula for determining the repurchase price of a loan if an originator such as Arlington is required to repurchase a loan. The definition is:

> An amount equal to (i) the greater of the Purchase Price or par multiplied by the outstanding principal balance of the Mortgage Loan as of the Purchase Date; less (ii) the aggregate amount received by the Purchaser of reductions and curtailments of the principal balance of the Mortgage Note; plus (iii) any and all interest payable on the outstanding principal balance of the Mortgage Note as of the date of repurchase; plus (iv) any and all expenses, including, without limitation, costs of foreclosure and reasonable attorneys' fees, incurred by Purchaser in the exercise by Purchaser of its rights and remedies in connection with the Mortgage Loan, the Mortgaged Property, and/or the Mortgagor, as more specifically identified in this Seller's Guide.

Baker Decl. Ex. B at § 800. If the seller is not repurchasing the loan, but instead indemnifying LBHI for its losses, then one deducts the proceeds of any sale of the loan. *Id.* at ¶ 22.

16.     Utilizing the formula set forth in the Seller's Guide's definition of "Repurchase Price," LBHI's damages from Arlington's breaches of contract on Loans ****2680 (Pimentel), ****2672 (Pimentel), ****2995 (Steinhouse), and ****3522 (McNair) total $600,544.55. Baker Decl. ¶¶ 21-37 & Exs. D, K, L, M.

17.     When prejudgment interest is added to LBHI's damages as required by applicable New York law, it yields a sum of $713,261.05 representing LBHI's total damages in this matter exclusive of attorneys' fees and costs.  Baker Decl. ¶ 38 & Ex. M.

**IV.    Gateway Explores Purchasing Arlington's Business**

18.     Gateway is a residential mortgage lender.  Pasceri Depo. 31:14-16.  Before the credit crisis, Gateway sold almost all of its loans on the secondary market to buyers such as Lehman Brothers Bank FSB, just as Arlington did.  Pasceri Depo. 34:17-35:22.

19.     Arlington had four shareholders:  Philip Russo, Kevin Kenyon, Joseph Granahan, and Daniel Lienhauser, with Mr. Russo as the majority stockholder.  Russo Depo. 54:19-55:18, Declaration of Matthew Spohn ("Spohn Decl.") Ex. W.  Mr. Russo was CEO and Mr. Kenyon was President.  Russo Depo. 56:17-22.  Messrs. Granahan and Lienhauser both held the title of Executive Vice President.  Russo Depo. 56:11-14.

20.     Arlington's owners initially reached out to Gateway about doing a deal because they were having "problems" and "wanted to stay in business . . . [and] basically keep their sales force intact."  Pasceri Depo. 60:11-61:5; *see also* Leinhauser Depo. 10:15-11:2 & 13:8-14:5; Pasceri Depo. 73:9-19 (Gateway's CEO understood the Arlington owners "wanted the company to somehow -- what they built in sales force and stuff to go on.").

21.     Arlington's owners' pitch was that they had seasoned sale staff and a specialization in "jumbo" loans that Gateway did not do.  Pasceri Depo. 61:8-19, Granahan Depo. 16:2-12.  Arlington could only offer Gateway its equipment and its ongoing business being generated by its sales staff.  Granahan Depo. 14:18-25.

22.     Gateway was interested because Arlington had business in locations where Gateway did not, and its CEO "thought that would be a great compliment to our book of business, increase our production."  Pasceri Depo. 61:25-62:11; *see also* Granahan Depo.

6

16:13-21.  Gateway was interested in incorporating Arlington's branches into its business "to have a new physical presence" in certain areas.  Pasceri Depo. 70:23-71:20.

23.     Gateway was focused upon obtaining Arlington's sales staff and its ongoing lending operations, known as the "pipeline," which would be a continuation of the business operations that Arlington had already started.  Pasceri Depo. 65:4-66:19; Russo Depo. 88:17-21.  The two went hand in hand—if Gateway did not take over Arlington's pipeline, then Arlington's sales staff would not come to Gateway.  Pasceri Depo. 65:4-66:19.  Gateway wanted Arlington's sales force to continue originating jumbo loans for Gateway.  *Id.*

24.     Arlington did not have many physical assets beyond office furniture and computers.  Granahan Depo. 13:7-16.  The main value of Arlington was its ongoing business operations and sales force because otherwise "you're only buying desks, computers and furniture . . . ."  Pasceri Depo. 66:23-68:12; *see also* Russo Depo. 88:17-21.  Aside from ongoing business and its sales force, "a mortgage company that does not service loans, okay, is really worth zero."  Pasceri Depo. 66:23-67:2.

**V.     Gateway Purchases Arlington's Business And Compensates Its Shareholders**

25.     According to the Asset Purchase Agreement the parties ultimately executed, Gateway purchased "all of [Arlington's] right, title and interest in and to the personal, tangible, intangible and other properties, rights and assets used in the operation of or held for use or useable in the Business," where "Business" is defined as Arlington's "retail mortgage origination services."  Spohn Decl. Ex. F at § 2.01 & "whereas" clause, p. 1.  It further clarified that Gateway purchased "all of the assets used by [Arlington] to conduct its mortgage origination business as it [was then] being conducted."  Spohn Decl. Ex. F at § 4.03; Pasceri Depo. 95:19-96:3; Granahan Depo. 15:10-14.

26.     The Asset Purchase Agreement required Arlington to continue to conduct its

7

business as it had done in the past and preserve its business organization through closing. Spohn Decl. Ex. F at § 6.01. Gateway's CEO asked for that provision so that the company would not fall apart between the time of the agreement and the time of closing "because then the sales guys are all running off and getting new jobs and we're, again, back to buying desks and, you know, furniture." Pasceri Depo. 97:12-98:6. In fact, Gateway and Arlington had attempted to keep their negotiations confidential "because once someone would know that a company is on the market, you know, a lot of bad things happen to the company who is for sale." Pasceri Depo. 63:23-64:4.

27.   The Asset Purchase Agreement required Arlington to "keep available the services of the current officers and employees of the Company that are engaged in the Business." Spohn Decl. Ex. F at § 6.01. Gateway's CEO wanted this provision "[b]ecause, until the closing, they still had to close loans to pay the salespeople; to pay, you know, some of the key employees we were going to hire. So they had to keep going until the actual closing date when we took over the underwriting and processing and so forth." Pasceri Depo. 98:7-22.

28.   The Asset Purchase Agreement required Arlington to "maintain the existing relations with Customers, creditors, business partners and others having business dealings with [Arlington] in connection with the Business." Spohn Decl. Ex. F at § 6.01. This was another provision Gateway's CEO had wanted. Pasceri Depo. 98:23-99:19.

29.   The Asset Purchase Agreement stated that "[i]t is the intention of [Gateway] that [Gateway] shall employ all of [Arlington's] existing qualified loan production and production support employees that are employed in connection with the operation of the Business." Spohn Decl. Ex. F at § 6.08. This provision was "very important" to Gateway's CEO. Pasceri Depo. 101:23-102:15. Gateway followed through and offered employment to all of Arlington's sales staff, numbering around 100 people. Pasceri Depo. 103:6-14. Only

"11 or 12" turned down the offers.  Pasceri Depo. 103:15-19.

30.     In addition, the Asset Purchase Agreement stated Gateway's intention to hire additional Arlington employees, including branch managers, closing managers, an operations manager, a compliance coordinator, underwriters, staff accountants, a secondary marketing supervisor, a controller, a financial analyst, an HR generalist, IT managers and IT support staff, and administrative assistants. Spohn Decl. Ex. F at § 6.08; *id.* at Ex. G, Request No. 3 & referenced attachment; Pasceri Depo. 107:2-12; Granahan Depo. 23:4-18.  It was Arlington owner Daniel Leinhauser's understanding that Gateway ended up offering employment to all of Arlington's employees.  Leinhauser Depo. 23:9-11.

31.     The Asset Purchase Agreement provided that Gateway assumed Arlington's liabilities, including Arlington's warehouse line, accounts payable, accrued expenses, accrued payroll, and a business loan made to Arlington on which Arlington's majority shareholder had personal exposure.  Spohn Decl. Ex. F at § 2.03 & Schedule 2.03; Pasceri Depo. 109:19-114:23; Russo Depo. 85:7-14.  Gateway also assumed responsibility for the lock fees and escrows relating to Arlington's in-process loan business.  Spohn Decl. Ex. F at § 2.03 & Schedule 2.03; Pasceri Depo. 114:24-115:3.

32.     At the same time, Arlington assigned to Gateway "substantially all of the contracts, liabilities and obligations of [Arlington] relating to [Arlington's] business and operation."  Spohn Decl. Ex. R at ¶ B; *id.* Ex. F at §§ 3.02 & 3.03; Pasceri Depo. 131:8-132:21; Russo Depo. 107:24-109:19.  Gateway also agreed to indemnify the four Arlington owners (and no one else) for any personal liability arising from the Arlington liabilities that Gateway assumed.  Spohn Decl. Ex. S; *id.* Ex. F at §§ 3.02 & 3.03; Pasceri Depo. 133:11-135:8; Russo Depo. 111:14-21.  Before this transaction, Arlington's owners had personal exposure with regard to Arlington's obligations.  Russo Depo. 84:10-13.  It was the

9

understanding of Arlington owner Joseph Granahan that Gateway "took over all the obligations, so that helped us out." Granahan Depo. 29:15-20.

33.     As part of the transaction between the two companies, Gateway sublet Arlington's main office and all of its branch offices. Spohn Decl. Exs. T & U; *id*. Ex. F at §§ 3.02 & 3.03; Pasceri Depo. 135:9-136:25; Russo Depo. 113:98-17. Gateway sublet the branch offices because "these were all offices that house salespeople, production support people and all that. So these were the offices that we obviously wanted to keep the salespeople there." Pasceri Depo. 137:2-11.

34.     The Asset Purchase Agreement provides for a $500,000 purchase price which was based on the value of Arlington's "pipeline" of loan business that Gateway was taking over. Spohn Decl. Ex. F at § 2.04; Pasceri Depo. 115:4-19. The $500,000 value was much more than the value of the company's fixed assets. Pasceri Depo. 115:20-116:7. "[T]he pipeline was the value, and the sales force, of course," Gateway's CEO testified. Pasceri Depo. 115:20-116:7. Arlington's CEO agreed that the purchase price represented the value of the entire Arlington company. Russo Depo. 65:12-20.

35.     The four shareholders of Arlington were given employment contracts with Gateway as part of the transaction with Gateway "for the image of the [Arlington] sales force believing that they were still going to have a relationship with these gentlemen . . . ." Pasceri Depo. 87:9-23; *see also id.* at 89:14-90:10; Spohn Decl. Exs. H, L, O, X. The employment agreement with the four owners of Arlington—and with no one else—were made a condition of closing the transaction between the companies. *Id.*; Spohn Decl. Ex. F at §§ 3.02 & 3.03.

36.     Arlington's CEO, Phil Russo, was brought into Gateway as President to make Arlington's sales force "feel more comfortable" at Gateway. Pasceri Depo. 68:12-23, 108:15-24. Messrs. Leinhauser, Granahan and Kenyon became Gateway branch managers, which

aided in the goal of keeping continuity between the business operations of the two companies because they had previously overseen all of the Arlington salespeople.  Pasceri Depo. 122:8-15; Kenyon Depo. 12:24-13:6.

37.     The four owners of Arlington were the only Arlington employees who were brought to Gateways at management-level positions.  Pasceri Depo. 140:16-141:6.  Michael Lord was Arlington's CFO but his employment agreement with Gateway was not a condition of closing because he was not an owner of Arlington.  Pasceri Depo. 88:17-89:7; Granahan Depo. 33:23-34:23.

38.     As a condition of closing the transaction between the companies, the four owners of Arlington—and no one else—were required to sign agreements not to compete with Gateway. Spohn Decl. Ex. F at §§ 3.02 & 3.03; Pasceri Depo. 87:24-88:4.  Gateway's CEO insisted upon those non-compete agreements because if Arlington's owners "go to another company and then recruit all the sales guys and then I purchased a pipeline that is pretty useless at that point, right?"  Pasceri Depo. 90:11-19.  Each non-competition agreement defined the restrained person as "Stockholder," and recited that "[i]n light of Stockholder's ownership of shares of capital stock of [Arlington], his position as an officer of [Arlington], and his employment by [Gateway] after the purchase of the assets of [Arlington], one of the conditions to the consummation by [Gateway] of the transaction contemplated in the Purchase Agreement is that Stockholder enter into this Agreement Not to Compete for the purpose of preserving for [Gateway's] benefit the proprietary rights and going business value of [Arlington]."  Spohn Decl. Exs. I, N, P & Y at ¶ D.  They further recited that Gateway was purchasing "substantially all of the assets of [Arlington], as a going concern, including business relationships and certain other intangible assets."  (*Id.*).

39.    As part of the closing of the transaction between the companies, each of the four owners of Arlington—and no one else—was provided with a substantial loan that would be forgiven after two years of employment with Gateway.  Spohn Decl. Exs. J, K, M, Q; Russo Depo. 104:20-24.  Each of the loans was ultimately forgiven.  Pasceri Depo. 117:12-25.

40.    In addition, as part of the closing of the transaction between the companies each of the owners received lump-sum cash payments that did not have any repayment terms at all. Spohn Decl. Exs. I, N, P & Y at ¶ 5; Lienhauser Depo. 27:2-7; Granahan Depo. 19:22-20:16; Kenyon  Depo. 28:8-18.

41.    At closing Mr. Russo received a $100,000 forgivable loan and $143,200 in cash; Mr. Lienhauser received a $65,000 forgivable loan and $60,000 in cash; Mr. Granahan received a $140,000 forgivable loan and $100,000 in cash; and Mr. Kenyon received a $100,000 forgivable loan and $60,000 in cash   Spohn Decl. Exs. I, N, P & Y at ¶ 5.  These forgivable loans and lump-sum payments totaling more than $750,000 were compensation for the Arlington owners' ownership interests, which were rendered worthless by the transaction with Gateway. Granahan Depo. 19:22-20:16, 31:17-32:2.  Mr. Granahan specifically requested the amount of his forgivable loan and lump-sum payment as compensation for his ownership interest in Arlington.  Granahan Depo. 32:18-33:14.

## VI.    Gateway Continues Arlington's Business Under The Arlington Name With Arlington Managers And Arlington Staff

42.    Gateway helped Arlington close out its obligations on its warehouse line[2] on the loans that were in process and were being taken over by Gateway, and then Arlington's former

---

[2] A warehouse line is a line of credit a line of credit that allows a loan originator such as Gateway to carry the amount of the loan between the time it is funded and the time that that loan is sold to an investor.  Pasceri Depo. 46:8-15.  It is crucial to the business of a mortgage originator.  *Id*. at 47:5-9.

sales staff began originating loans on Gateway's warehouse line with the same lender. Pasceri

Depo. 99:23-101:22. As summarized by Gateway's CEO:

> Q.     So you needed to coordinate the warehouse lines of Arlington and
> Gateway so that you could keep an uninterrupted flow of Arlington's business?
> A.     Correct, because you – in order to do a transaction, the warehouse banks
> have to approve it. It's in your covenants. So, you know, I wanted that approval.
> So I tried to give them some security based on getting that.

Pasceri Depo. 101:7-16.

43.     Most of the loan purchasers ("investors") with whom Arlington had worked were

ones that Gateway was already working with. Pasceri Depo. 143:15-19. Accordingly, after the

Arlington transaction, the former Arlington sales force originated loans under the Gateway name

that were sold to the same investors. Pasceri Depo. 143:25-144:6. Gateway informed its

warehouse lender "that we were going to take over the [Arlington's] pipeline; we were going to

merge in the [Arlington] salespeople," and the lender approved the transaction. Pasceri Depo.

145:11-146:16.

44.     There was no interruption in business as a result of the transaction with Gateway;

Arlington's ongoing business was able to be continued without any ongoing residential loans

being abandoned. Granahan Depo. 30:16-31:16. According to Arlington's CEO, "[t]he intention

was for us to try to transfer the pipeline as seamlessly from Arlington to Gateway as we possibly

could so that no customer transactions were interrupted." Russo Depo. 109:13-17; *see also*

Granahan Depo. 15:15-16:25 (the goal was that nothing would be done to interrupt Arlington's

business so that there would be a seamless transition to Gateway).

45.     Gateway used the Arlington name as a d/b/a for the former Arlington branches.

Pasceri Depo. 146:22-147:9, 152:6-13. It was important to Arlington that its sales force continue

to use the Arlington name at Gateway "because they had already had relationships with financial

planners and, you know, guys that knew the name 'Arlington.'" Pasceri Depo. 69:3-11.

46.     Gateway continued to use Arlington's phone numbers in each of the former Arlington offices, Pasceri Depo. 147:19-148:14, Leinhauser Depo. 22:12-14, and had traffic to Arlington's website redirected to Gateway's website.  Pasceri Depo. 148:21-149:19; Russo Depo. 124:21-125:17; Leinhauser Depo. 22:15-21.  The goal of these moves was to make the transaction between the companies as seamless as possible for Arlington's former employees and customers.  Pasceri Depo. 149:16-19; Russo Depo. 122:13-20; Granahan Depo. 23:19-24:18.  As Arlington's CEO testified, "there was definitely some effort put into trying to sell the concept that it's going to be easy to continue to do business; it's not going to be hard."  Russo Depo. 119:8-120:4.

47.     Messrs. Leinhauser, Granahan and Kenyon had overseen the sales staff at Arlington.  Kenyon Depo. 12:24-13:6.  They continued to do so at Gateway, overseeing the former Arlington sales staff in the former Arlington branches under the d/b/a of Arlington. Leinhauser Depo. 20:5-22:11, 24:15-24; Granahan Depo. 17:21-18:19.

48.     The continuation of the Arlington name and Arlington branches helped maintain the goodwill Arlington had built up.  Russo Depo. 124:5-20.  The former Arlington personnel were able to continue their marketing efforts uninterrupted after the transaction, directed to the same customer base in the same markets.  Granahan Depo. 30:24-31:16; Leinhauser Depo. 25:16-26:11.  The former Arlington sales staff also continued to originate the jumbo loans that were Arlington's specialty.  Pasceri Depo. 158:8-18.

**VII.   After The Transaction With Gateway, Arlington Wound Down**

49.     Arlington could no longer originate loans after the closing with Gateway.  Pasceri Depo. 93:17-94:10.  The Arlington owners' agreements with Gateway only allowed them to wind down the business of Arlington, and not continue it.  Spohn Decl. Exs. H, L, O, & X at ¶ 1; Russo Depo. 66:22-67:20.  Mr. Leinhauser and Mr. Granahan both understood that Arlington

would wind down and their ownership interest would be worthless as a result.  Leinhauser Depo. 28:14-29:2, Granahan Depo. 18:20-19:17.    Arlington's former CEO, Mr. Russo, admits the goal is to wind down Arlington "sometime before I die."  Russo Depo. 102:14-16.

## ARGUMENT

Summary judgment shall be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if it "might affect the outcome of the suit under the governing law;" a dispute over a material fact is "genuine" only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of establishing that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets its burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249.

## I.    <u>The Debt Owed To LBHI By Arlington Is Not Disputed.</u>

LBHI's claim for breach of contract against Gateway's predecessor, Arlington, is undisputed.  The Court should apply New York law to LBHI's contract claim given the New York choice-of-law provision in Section 8 of the parties' Agreement.  (Baker Decl. Ex. A at ¶ 4). Under New York contract law, "a plaintiff is entitled to summary judgment as to liability on a breach of contract claim if it establishes (1) the existence of a valid contract, (2) its own performance under the contract, and (3) defendant's breach of its obligations under the contract." *Morgan  Guar.  Trust  Co.  v.  Bay  View  Franchise  Mortgage  Acceptance  Co.*,  No. 00CIV.8613(SAS), 2002 WL 818082, at *2 (S.D.N.Y. Apr. 30, 2002).  It has previously been

held that "[u]nder New York law, a loan seller's failure to repurchase non-conforming loans upon demand as required by a contract is an independent breach of the contract entitling the plaintiff to pursue general contract remedies for breach of contract." *See LaSalle Bank Nat'l Ass'n v. Lehman Brothers Holdings, Inc.*, 237 F. Supp. 2d 618, 638 (D. Md. 2002) (citing *Resolution Trust Corp. v. Key Fin. Svcs., Inc.*, 280 F.3d 12, 17-18 (1st Cir. 2002)).

Here, each element of LBHI's claim is established by undisputed facts

### A.   The parties have a valid contract that LBHI performed.

LBHI satisfies the three elements of a breach-of-contract claim against Arlington.  First, there is no dispute that valid contracts exist here.  (Stmt. ¶¶ 2 & 4).  Second, there is no dispute that LBHI and its assignor performed their obligations under that contract.  (Stmt. ¶ 3).

### B.   Arlington breached the Agreement with respect to each loan in suit.

Arlington's breach of its agreement with LBHI's assignor is also established by undisputed facts.  Loans ****2680 (Pimentel), ****2672 (Pimentel), and ****2995 (Steinhouse) were all subject to Indemnification Agreements that Arlington executed with LBB and Aurora, which were then assigned to LBHI. (Stmt. ¶¶ 12-13).  Arlington agreed to provide indemnity for all losses, damages, costs, fees, etc. suffered on these loans within 30 days of written demand. (*Id.*).  Though LBHI demanded that Arlington indemnify LBHI for its losses on these loans, Arlington breached these Indemnification Agreements by failing to pay any indemnity to LBHI within 30 days of demand.  (*Id.* at ¶ 14).

Arlington's liability for Loan ****3522 (McNair) is easily determined by comparing the borrower's representations in the loan files to the actual, undisputed facts.  In the Agreement assigned to LBHI, Arlington represented, warranted and covenanted that for the loans it sold to LBB:

16

No document, report or material furnished to Purchaser in any Mortgage Loan
File or related to any Mortgage Loan (including, without limitation, the
Mortgager's application for the Mortgage Loan executed by the Mortgagor), was
falsified or contains any untrue statement of fact or omits to state a fact necessary
to make the statements contained therein not misleading.

(Stmt. ¶ 5). Arlington also acknowledged in the Agreement that LBB purchased loans from

Arlington "in reliance upon (i) the truth and accuracy of Seller's representations and warranties

set forth in the Loan Purchase Agreement and this Seller's Guide, each of which representations

and warranties relates to a matter material to such purpose . . ." (*Id*. at ¶ 6). However, the loan

documents for Loan ****3522 (McNair) materially misrepresented the borrower's debts,

omitting prior mortgage loans outstanding at the time the loan closed. (Stmt. ¶ 9-10). Despite

demand, Arlington failed to repurchase the loan or pay indemnity for losses suffered on it. (*Id*. at

¶ 11).

### C.     LBHI has suffered $713,261.05 in damages caused by Arlington's breach.

There is no dispute as to the amount of LBHI's damages caused by Arlington's breach of

contract. The Seller's Guide provides that repurchase shall be made at the "Repurchase Price"

which is defined in the parties' agreement. (Stmt. ¶ 15). That formula sets damages at the

amount LBHI's assignor paid for the loans, plus accrued interest due from the borrower and

expenses incurred in servicing the loan, foreclosing upon it, or protecting LBHI's interest in the

collateral, less amounts LBHI received from payments on the loans or proceeds of their

disposition or sale. (*Id*.). If the seller is not repurchasing the loan, but instead indemnifying

LBHI for its losses, the contractual formula is used while deducting the proceeds of any sale of

the loan or liquidation of the collateral securing the loan. (*Id*.).

Applying the contractual formula to the hard data from LBHI's business records, LBHI's

damages through the date of Arlington's defaults are $600,544.55. (Stmt. ¶16). This calculation

applies the undisputable facts of LBHI's financial records to the parties' contractual agreement

regarding how damages are calculated.

LBHI is also entitled to prejudgment interest as an element of its damages. The agreement between LBHI and Arlington is governed by New York law and New York law provides for mandatory prejudgment interest on contract claims at a rate of 9% per annum. *See* New York Civil Practice Law and Rules §§ 5001, 5002, & 5004. Applying this prejudgment interest from the date of Arlington's breaches to February 1, 2013, and adding it to the damages as of the date of the breaches, LBHI's total damages inclusive of prejudgment interest are $713,261.05. (*Id.* at ¶ 17).

The Seller's Guide also provides that Arlington, the Seller, "agrees that it shall pay the reasonable attorney's fees of Purchaser incurred in enforcing Seller's obligations hereunder, including without limitation, the repurchase obligation set forth above." (Baker Decl. Ex. B at § 711). LBHI will submit its motion for an award of attorneys' fees within 14 days of entry of judgment pursuant to Fed. R. Civ. P. 54(d)(2).

## II.   <u>Gateway Is Arlington's Successor, Liable For It Debts, Under Pennsylvania Law</u>.

Next, the undisputed facts establish that Gateway is Arlington's successor, liable for Arlington's debts owed to LBHI, by reason of the companies' *de facto* merger under Pennsylvania law.

A company purchasing the assets of another company is liable for that company's debts and liabilities "if it is established that (1) the purchaser expressly or implicitly agreed to assume liability, (2) the transaction amounted to a consolidation or merger, (3) the purchasing corporation was merely a continuation of the selling corporation, (4) the transaction was fraudulently entered into to escape liability, or (5) the transfer was without adequate consideration and no provisions were made for creditors of the selling corporation." *Cont'l Ins. Co. v. Schneider, Inc.*, 582 Pa. 591, 599-600, 873 A.2d 1286, 1291 (2005). Theories (2) and (3)

have been collapsed into the legal principle of *de facto* merger by courts applying Pennsylvania law. *See, e.g., Fiber-Lite Corp. v. Molded Acoustical Products of Easton, Inc.*, 186 B.R. 603, 609 (E.D. Pa. 1994) *aff'd*, 66 F.3d 310 (3d Cir. 1995).

"[A] *de facto* merger analysis . . . requires that a court look beyond the superficial formalities of a transaction in order to examine the transactional realities and their consequences. . . . As various cases have revealed, transactional realities sometimes require a scrutiny that extends the focus beyond the confines of the immediate consequences of the proximal asset purchase agreement." *Fizzano Bros. Concrete Products, Inc. v. XLN, Inc.*, 42 A.3d 951, 968-69 (Pa. 2012).  To conduct this analysis, a court generally looks at the following factors: (1) the continuation of the enterprise;  (2) the assumption of obligations to allow continuity of normal business operations; (3) the continuation of ownership; and (4) whether the seller corporation ceases operations.  *Com. v. Lavelle*, 382 Pa. Super. 356, 375, 555 A.2d 218, 227 (1989).  These factors "are not a mechanically-applied checklist, but a map to guide a reviewing court to a determination that, under the facts established, for all intents and purposes, a merger has or has not occurred between two or more corporations, although not accomplished under the statutory procedure." *Fizzano Bros. Concrete Products, Inc. v. XLN, Inc.*, 42 A.3d 951, 969 (Pa. 2012).

Applying these principles to the undisputed facts of the case at hand, there can be no question that Arlington was merged into Gateway as a matter of law.

### A.   Gateway Is A Continuation Of Arlington, Including Its Management, Personnel, Physical Location, Assets, and General Business Operations

The first *de facto* merger factor is the continuation of the enterprise of the seller corporation, such as the continuity of management, personnel, physical location, assets, and general business operations. *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 310 (3d Cir. 1985).  This prong is amply satisfied by the undisputed facts of the transaction:

19

- The transaction came about because the Arlington owners "wanted to stay in business . . . [and] basically keep their sales force intact," and Gateway wanted Arlington's pipeline of ongoing business, its sales staff, and the ability to expand its business into the locations being served by Arlington.  (Statement of Undisputed Fact ("Stmt."), *supra*, ¶¶ 20-23).

### Continuity of management

- The Asset Purchase Agreement required Arlington to "keep available the services of the current officers . . . of the Company that are engaged in the Business." (Stmt. ¶ 27).

- The four shareholders of Arlington were given employment contracts with Gateway as part of the transaction with Gateway "for the image of the [Arlington] sales force believing that they were still going to have a relationship with these gentlemen . . . ."  The employment agreement with the four owners of Arlington—and with no one else—were made a condition of closing the transaction between the companies.  (Stmt. ¶ 35).

- Arlington's CEO was brought into Gateway as President to make Arlington's sales force "feel more comfortable" at Gateway and Arlington's President and Executive Vice Presidents became Gateway branch managers, which aided in the goal of keeping continuity between the business operations of the two companies because they had previously overseen all of the Arlington salespeople.  (Stmt. ¶ 36).

- Arlington's President and Executive Vice Presidents had overseen the sales staff at Arlington and continued to do so at Gateway, overseeing the former Arlington sales staff in the former Arlington branches under the d/b/a of Arlington.  (Stmt. ¶ 47).

### Continuity of personnel

- The Asset Purchase Agreement required Arlington to "keep available the services of the current . . . employees of the Company that are engaged in the Business." (Stmt. ¶ 27).

- The Asset Purchase Agreement stated that "[i]t is the intention of [Gateway] that [Gateway] shall employ all of [Arlington's] existing qualified loan production and production support employees that are employed in connection with the operation of the Business," and additional staff as well.  Gateway followed through and offered employment to all of Arlington's sales staff, as well all or most of its remaining employees.  (Stmt. ¶¶ 29-30).

- To obtain its primary lender's approval of the Arlington transaction, Gateway represented that "we were going to merge in the [Arlington] salespeople."  (Stmt. ¶ 42).

20

*Continuity of physical location*

- As part of the transaction between the two companies, Gateway sublet Arlington's main office and all of its branch offices because "these were all offices that house salespeople, production support people and all that. So these were the offices that we obviously wanted to keep the salespeople there." (Stmt. ¶ 33).

- After the transaction with Gateway the former Arlington salespeople continued to operate out of the former Arlington locations under the Arlington name, using the Arlington phone numbers for those locations. (Stmt. ¶¶ 45-48).

*Continuity of assets and general business operations*

- According to the Asset Purchase Agreement the parties ultimately executed, Gateway purchased "all of [Arlington's] right, title and interest in and to the personal, tangible, intangible and other properties, rights and assets used in the operation of or held for use or useable in the Business," where "Business" is defined as Arlington's "retail mortgage origination services." It further clarified that Gateway purchased "all of the assets used by [Arlington] to conduct its mortgage origination business as it [was then] being conducted." (Stmt. ¶ 25).

- The Covenants Not To Compete executed by all four owners of Arlington in connection with the closing of the transaction between the companies recited that Gateway was purchasing "substantially all of the assets of [Arlington], as a going concern, including business relationships and certain other intangible assets." (Stmt. ¶ 38).

- The Asset Purchase Agreement required Arlington to continue to conduct its business as it had done in the past and preserve its business organization through closing. Gateway's CEO asked for that provision so that the company would not fall apart between the time of the agreement and the time of closing "because then the sales guys are all running off and getting new jobs and we're, again, back to buying desks and, you know, furniture." (Stmt. ¶ 26).

- The Asset Purchase Agreement required Arlington to "maintain the existing relations with Customers, creditors, business partners and others having business dealings with [Arlington] in connection with the Business." (Stmt. ¶ 28).

- The Asset Purchase Agreement provides for a $500,000 purchase price which was based on the value of Arlington's "pipeline" of loan business that Gateway was taking over. The purchase price was much more than the value of the company's fixed assets which would be limited to things like "desks, computers and furniture;" it represented the value of the entire Arlington company. (Stmt. ¶¶ 34 & 24).

- After the Gateway transaction, the former Arlington sales force originated loans under the Arlington name that were sold to the same purchasers. (Stmt. ¶ 43).

21

- There was no interruption in business as a result of the transaction with Gateway; Arlington's ongoing business was able to be continued without any ongoing residential loans being abandoned.  (Stmt. ¶ 44).

- Gateway used the Arlington name as a d/b/a for the former Arlington branches.  It was important to Arlington that its sales force continue to use the Arlington name at Gateway "because they had already had relationships with financial planners and, you know, guys that knew the name 'Arlington.'"  (Stmt. ¶ 45).

- Gateway continued to use Arlington's phone numbers in each of the former Arlington offices, and had traffic to Arlington's website redirected to Gateway's website.  The goal of these moves was to make the transaction between the companies as seamless as possible for Arlington's former employees and customers.  (Stmt. ¶ 46).

- The continuation of the Arlington name and Arlington branches helped maintain the goodwill Arlington had built up.   The former Arlington personnel were able to continue their marketing efforts uninterrupted after the transaction, directed to the same customer base in the same markets.  The former Arlington sales staff also continued to originate the jumbo loans that were Arlington's specialty.  (Stmt. ¶ 48).

These facts fit neatly with similar facts that other courts have considered in finding a continuity of enterprise supporting successor liability under Pennsylvania law.  For instance, in *Com. v. Lavelle*, 382 Pa. Super. 356, 376, 555 A.2d 218, 228 (1989), the court upheld a finding of *de facto* merger and specifically the continuity of business factor where there was uncontradicted evidence that (1) the predecessor company's owner represented himself as the successor's President, (2) all the predecessor company's employees became employees of the successor; (3) the successor operated out of the predecessor company's premises; (4) the successor purchased the predecessor company's major assets; and (5) the successor took over all of the predecessor company's contracts.  All of those facts are present here.  Similarly, in *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 311 (3d Cir. 1985) the Third Circuit affirmed a finding of successor liability where the predecessor company:

> was to use its best efforts to keep its business organization intact, to keep available to [the successor] the service of its present employees and to maintain its relationship with its customers and suppliers for [the successor's] benefit; [the

predecessor company's] management and personnel became a part of [the successor]; [the predecessor company] was required, to the extent permitted by law, to transfer to [the successor] the right to use its corporate name . . . following closing, [the successor] continued to operate the [predecessor company's] plants, produce the same . . . products and represented to [the predecessor company's] customers that the [predecessor company's] resins had became a part of [the successor's Organics Department.

Again, these facts are all present here. *See also Fiber-Lite Corp. v. Molded Acoustical Products of Easton, Inc.*, 186 B.R. 603, 610 (E.D. Pa. 1994) *aff'd*, 66 F.3d 310 (3d Cir. 1995) (finding *de facto* merger where (1) the successor produced and sold the same or similar product that had been produced and sold by the predecessor company, (2) in the first four to six months after the closing, the successor used the same facility as the predecessor company; (3) the successor hired all individuals who had previously been employed by the predecessor company; and (4) the successor used a name that the owner testified "sort of kept the continuity of the company and the image of the [predecessor] company intact."); *Knapp v. N. Am. Rockwell Corp.*, 506 F.2d 361, 369 (3d Cir. 1974) (finding prima facie case of successor liability where the successor (1) acquired almost all of the predecessor company's assets, (2) assumed practically all of the predecessor company's assets; (3) required the predecessor company to use its best efforts to preserve its business organization through closing (4) required the predecessor company to make available to the successors all of its existing officers and employees, (5) required the predecessor company to maintain its relationships with its customers and suppliers, and (6) continued the predecessor company's former business operations).

The Pennsylvania Supreme Court recently addressed similar facts to those presented here in *Fizzano Bros. Concrete Products, Inc. v. XLN, Inc.*, 42 A.3d 951 (Pa. 2012). In that case the trial court found a *de facto* merger and the Pennsylvania Superior Court reversed; the Pennsylvania Supreme Court reversed the intermediate-court decision for improper fact-facting on appeal and remanded for further proceedings, though Justice Baer dissented in part to state

that the trial court's decision should have been reinstated. *Fizzano Bros. Concrete Products, Inc. v. XLN, Inc.*, 42 A.3d 951, 974 (Pa. 2012); *id* at 975 (Saylor, J., concurring and dissenting). It is instructive that in that case, as recounted by the Supreme Court, the trial court found a continuity of business because (1) "key personnel" from the predecessor company were also key personnel in the successor; (2) there was a continuity of employees; (3) there was a continuation of physical location; (4) the successor acquired almost all of the assets of the predecessor company except its stock; and (5) the companies' "general business operations . . . were the same, involving the same essential personnel, key asset, customers (except for the two retained by [the predecessor company]), and office location." *Fizzano Bros. Concrete Products, Inc.* v. XLN, Inc., 42 A.3d 951, 957 (Pa. 2012). All these same factors are present here.

In short, Gateway has no basis to dispute that there was a continuity of enterprise between Arlington and Gateway.

### B.    Gateway Explicitly Assumed All Of Arlington's Liabilities Necessary for Uninterrupted Continuation of Arlington's Business

The second *de facto* merger factor is "assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor." *Lavelle*, 555 A.2d at 227. As explained above, Arlington's business was indeed continued without any interruption. The undisputed facts show that this was accomplished in part through Gateway's assumption of Arlington's liabilities:

- The Asset Purchase Agreement provided that Gateway assumed Arlington's liabilities, including Arlington's warehouse line, accounts payable, accrued expenses, accrued payroll, and a business loan made to Arlington on which Arlington's majority shareholder had personal exposure. (Stmt. ¶ 31).

- Per the Asset Purchase Agreement, Gateway also assumed responsibility for the lock fees and escrows relating to Arlington's in-process loan business. (Stmt. ¶ 31).

24

- It was the understanding of Arlington owner Joseph Granahan that Gateway "took over all the obligations, so that helped us out."  (Stmt. ¶ 32).

- In connection with the closing of the transaction between the companies, Arlington assigned to Gateway "substantially all of the contracts, liabilities and obligations of [Arlington] relating to [Arlington's] business and operation." (Stmt. ¶ 32).

- In connection with the closing of the transaction between the companies, Gateway agreed to indemnify the four Arlington owners for any personal liability arising from the Arlington liabilities that Gateway assumed.  (Stmt. ¶ 32).

- As part of the transaction between the two companies, Gateway sublet Arlington's main office and all of its branch offices.  (Stmt. ¶ 33).  This allowed Gateway to pay the rents on those leases, so that Arlington would not be required to.

These same facts have supported other courts' findings one this *de facto* merger factor.

See *United States v. Gen. Battery Corp., Inc.*, 423 F.3d 294, 308 (3d Cir. 2005) (successor expressly assumed the predecessor's "contractual obligations and all other obligations appearing on [its] balance sheet") (applying Pennsylvania law); *Com. v. Lavelle*, 382 Pa. Super. 356, 376, 555 A.2d 218, 228 (1989) (successor "assumed various accounts payable" and its contracts).  For purposes of *de facto* merger analysis, Gateway has no basis to dispute that it assumed the liabilities ordinarily necessary for the uninterrupted continuation of Arlington's business.

### C.     Gateway Compensated Arlington's Owners For Their Ownership Interests, Providing The Required Continuity Of Ownership

The third *de facto* merger factor is the continuity of ownership between the predecessor company and the successor.  In *Fizzano Brothers Concrete Products, Inc. v. XLN, Inc.* the Pennsylvania Supreme Court held that this factor does not require that the shareholders of the predecessor company become shareholders of the successor.  Such a result would be "incongruous" considering that under an explicit statutory merger "shareholders of the predecessor corporation may surrender their shares of stock for 'obligations' of the successor corporation or, in partial manner, 'cash, property, or rights' in lieu of shares in the successor corporation . . . ." 42 A.3d 951, 968 (Pa. 2012) (emphasis in original).

25

Accordingly, we hold that in cases rooted in breach of contract and express warranty, the *de facto* merger exception requires "some sort of" proof of continuity of ownership or stockholder interest. . . . However, such proof is not restricted to mere evidence of an exchange of assets from one corporation for shares in a successor corporation. Evidence of other forms of stockholder interest in the successor corporation may suffice; indeed 15 Pa.C.S. § 1922(a)(3) contemplates that continuing shareholder interest pursuant to a statutory merger may take the form of "obligations" in lieu of shares in the new or surviving corporation.

*Id.* at 969 (Pa. 2012) (internal citations omitted).

Here, Gateway compensated the four owners of Arlington (and only those four individuals) for their ownership interests with a combination of cash payments, forgivable loans, and new obligations as follows:

- As part of the closing of the transaction between the companies, each of the four owners of Arlington—and no one else—was provided with a substantial loan that would be forgiven after two years of employment with Gateway.  (Stmt. ¶ 39).

- In addition, as part of the closing of the transaction between the companies each of the owners—and no one else—received lump-sum cash payments that did not have any repayment terms at all.  (Stmt. ¶ 40).

- At closing Arlington owner Phillip Russo received a $100,000 forgivable loan and $143,200 in cash; Arlington owner Daniel Lienhauser received a $65,000 forgivable loan and $60,000 in cash; Arlington owner Joseph Granahan received a $140,000 forgivable loan and $100,000 in cash; and Arlington owner Kevin Kenyon received a $100,000 forgivable loan and $60,000 in cash.  These forgivable loans and lump-sum payments totaling more than $750,000 were compensation for the Arlington owners' ownership interests, which were rendered worthless by the transaction with Gateway.  Mr. Granahan specifically requested the amount of his forgivable loan and lump-sum payment as compensation for his ownership interest in Arlington.  (Stmt. ¶ 41).

- In the Asset Purchase Agreement, Gateway assumed a business loan made to Arlington on which Arlington's majority shareholder Phillip Russo had personal exposure.  (Stmt. ¶ 31).

- In connection with the closing of the transaction between the companies, Gateway took on the obligation to indemnify the four Arlington owners (and no one else) for any personal liability arising from the Arlington liabilities that Gateway assumed, relieving them of their personal exposure on those liabilities.  (Stmt. ¶ 32).

26

These facts fit neatly under the *Fizzano* court's flexible analysis of the "continuity of ownership" factor.  Gateway explicitly compensated the Arlington owners for their stock which was rendered worthless by the transaction; this is even clearer than the fact in *Fizzano*, where the shareholders of the predecessor company "surrendered their shares in the [first predecessor company] in return for secured promissory notes of considerable value, which were ultimately transferred to [the successor]." *Fizzano*, 42 A.3d at 970. In addition, Gateway explicitly took over obligations that would have been the Arlington owners' personal obligations otherwise.  Accordingly, there is ample undisputed evidence of a "continuity of ownership" as defined by the Pennsylvania Supreme Court.

### D.   Arlington Was Reduced To An Assetless Shell After The Transaction With Gateway

The final *de facto* merger factor is sometimes stated as "a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible," *Com. v. Lavelle*, 382 Pa. Super. 356, 375, 555 A.2d 218, 227 (1989), but this is misleading.  In the case that used that language, *Commonwealth v. Lavelle*, the court found the factor was met where "[t]here was . . . a cessation of ordinary business by [the predecessor company] shortly after the formation of [the successor], and, although the corporation was not dissolved, it was reduced to an assetless shell." 382 Pa. Super. 356, 376, 555 A.2d 218, 228 (1989); *see Chicago Title Ins. Co. v. Lexington & Concord Search & Abstract, LLC*, 513 F. Supp. 2d 304, 315 (E.D. Pa. 2007) (citing *Lavelle* for the proposition that "[t]he predecessor corporation need not actually dissolve; reduction to an assetless shell is sufficient" to satisfy this prong of the *de facto* merger analysis). The Third Circuit, applying Pennsylvania law, has likewise noted that "[d]enying [the plaintiff] the right to sue [the successor] because of the barren continuation of [the predecessor] after the exchange with [the successor] would allow a formality to defeat [the plaintiff's] recovery."

27

*Knapp v. N. Am. Rockwell Corp.*, 506 F.2d 361, 368-69 (3d Cir. 1974). In that case although the predecessor "technically existed as an independent corporation, it had no substance." *Id.*; *see also Hwang Law Firm, LLC v. United States*, CIVA 07-2973, 2008 WL 2704316 at *9 (E.D. Pa. July 9, 2008).

The same is true here. Arlington was a mortgage origination company (Stmt. ¶ 1), but it sold to Gateway all the assets it used in its business (*id.* at ¶ 25), leaving it an assetless shell. Moreover, Arlington was prohibited from continuing its business after the transaction with Gateway—the owners' non-compete agreements with Gateway only allowed them to wind the business down, which they proceeded to do. (Stmt. ¶ 49).

Because the undisputed facts show that the transaction with Gateway left Arlington as an "assetless shell," the final factor of the *de facto* merger analysis is also satisfied.

### E.      Gateway Is Therefore Liable For Arlington's Debt To LBHI.

Though the four-factor analysis of *de facto* merger is not a "mechanically-applied checklist," where the undisputed evidence shows that all four factors are satisfied then there is no reason to withhold judgment. *See, e.g., Fiber-Lite Corp. v. Molded Acoustical Products of Easton, Inc.*, 186 B.R. 603, 610-11 (E.D. Pa. 1994) *aff'd*, 66 F.3d 310 (3d Cir. 1995). Accordingly, LBHI requests summary judgment on the issue of Gateway's *de facto* merger with Arlington.

Because of the *de facto* merger between the companies, Gateway is liable for Arlington's undisputed debt to LBHI. Pennsylvania's Business Corporation Law provides that upon a merger, the successor is liable for all of the predecessor's "debts due on whatever account" and all of the predecessor's liabilities. 15 Pa. Cons. Stat. Ann. § 1929. This applies even when the merger is *de facto* and not statutory. *See Com. v. Lavelle*, 382 Pa. Super. 356, 378, 555 A.2d

218, 229 (1989).  Accordingly, judgment should be entered against Gateway for the $713,261.05 plus attorneys' fees and costs owed to LBHI.

## CONCLUSION

For all the foregoing reasons, LBHI respectfully requests that the Court grant LBHI summary judgment pursuant to Fed. R. Civ. P. 56 in the amount of $713,261.05, plus fees and costs to be determined pursuant to Fed R. Civ. P. 54(d)(2) , or alternatively grant partial summary judgment as the Court deems appropriate.

FULBRIGHT & JAWORSKI L.L.P

By:        s/ Matthew D. Spohn

Matthew D. Spohn (*pro hac vice*)
Tabor Center
1200 17th Street, Suite 1000
Denver, CO 80202-5835
Phone:  303-801-2760
Fax:      303-801-2777
Email:  mspohn@fulbright.com

and

ANTHEIL MASLOW & MACMINN, LLP

By:        s/ Thomas P. Donnelly

Thomas P. Donnelly, Esq. #69590
131 W. State Street
Doylestown, PA 18901
Tel:  215-230-7500
Fax:  215-230-7796
Email:  tdonnelly@ammlaw.com

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

LEHMAN BROTHERS HOLDINGS INC.,

      Plaintiff,

    vs.

GATEWAY FUNDING DIVERSIFIED
MORTGAGE SERVICES, L.P.

      Defendant.

CIVIL ACTION NO. 2:11-cv-06089-AB

## CERTIFICATE OF SERVICE

    Thomas P. Donnelly, Esquire, Attorney for Plaintiff Lehman Brothers Holdings, Inc. hereby certifies that a copy of the foregoing Motion for Summary Judgment and Brief in Support thereof is being served upon counsel of record electronically on January 31, 2013 via this Court's Electronic Case Filing system, and further, that the Declarations and Exhibits thereto referenced in said Motion and Brief are being hand delivered to the Court for filing and being served upon counsel of record by personal service on February 1, 2013, at the following address:

Kenneth T. Ulrich, Esq.
Gateway Funding Diversified Mortgage Services, L.P.
300 Welsh Rd.
Building 5, Suite 231
Horsham, PA 19044

ANTHEIL MASLOW & MACMINN, LLP

By:    <u>     s/ Thomas P. Donnelly     </u>
          Thomas P. Donnelly, Esquire
          Counsel for Plaintiffs