**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LEHMAN BROTHERS | : | |
| HOLDINGS INC., | : | |
| Plaintiff | : | CIVIL ACTION |
| | : | No. 11-6089 |
| v. | : | |
| | : | |
| GATEWAY FUNDING | : | |
| DIVERSIFIED MORTGAGE | : | |
| SERVICES, L.P. | : | |
| Defendant | : | |

**<u>MEMORANDUM</u>**

April 25, 2013                                   ANITA B. BRODY, J.

Plaintiff Lehman Brothers Holdings Inc. ("LBHI") brings this suit against Defendant

Gateway Funding Diversified Mortgage Services, L.P. ("Gateway"), involving home mortgage

loans. Both Lehman and Gateway have filed motions for summary judgment.

## I.      FACTUAL BACKGROUND

In August 2001, Arlington Capital Mortgage Corporation ("Arlington"), a mortgage

origination company, entered into a Loan Purchase Agreement with Lehman Brothers Bank, FSB

("LBB"), a subsidiary of LBHI.[1] Under the agreement, LBB agreed to buy mortgage loans "from

time to time" from Arlington. The agreement specifically incorporated a "Seller's Guide."[2] The

---

[1] The agreement was amended on November 20, 2006.

[2] The Seller's Guide was prepared by Aurora Loan Services LLC ("Aurora"), a subsidiary and
agent of LBB. Aurora was the servicer on the loans purchased by LBB.

1

Seller's Guide included various representations, warranties and covenants made by Arlington, the seller of the loans. *See* Declaration of John Baker ("Baker Decl."), Ex. B. It stated that LBB purchased the loans in reliance upon "the truth and accuracy of Seller's representations and warranties set forth in the Loan Purchase Agreement and this Seller's Guide." *Id.* at § 701. Under the Seller's Guide, Arlington represented that

> [n]o document, report or material furnished to Purchaser in any Mortgage Loan File or related to any Mortgage Loan (including, with limitation, the Mortgagor's application for the Mortgage Loan executed by the Mortgagor), was falsified or contains any untrue statement of facts or omits to state a fact necessary to make the statements contained therein not misleading.

*Id*. at § 703 ¶ 1. The Seller's Guide further provided that in the event of a breach of any of the representations, warranties or covenants resulting in damage to LBB, LBB may require Arlington to "repurchase the related Mortgage Loan (in the case of a breach of the representations, warranties or covenants contained in *Section 703* hereof or an Early Payment Default) at the Repurchase Price." *Id.* at § 710. In addition, the Guide stated that Arlington

> shall indemnify [LBB] . . . from and hold them harmless against all claims, losses, damages, penalties, fines, claims, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that [LBB] may sustain in any way related to or resulting from any act or failure to act or any breach of any warranty, obligation, representation or covenant in or made pursuant to this Seller's Guide or the Loan Purchase Agreement . . .

*Id*. at § 711.

Under this Loan Purchase Agreement, LBB bought the four mortgage loans from Arlington that form the basis of this suit. These loans are referred to as ****2680 (Pimentel), ****2672 (Pimentel), ****2995 (Steinhouse), and ****3522 (McNair) (hereinafter referred to as the Pimentel, Steinhouse, and McNair loans, respectively).

LBB later sold these four loans to LBHI, the Plaintiff in this suit and of which LBB is a subsidiary, and assigned to LBHI the rights it had under the Loan Purchase Agreement. For purposes of this opinion, I will refer to LBHI and LBB as "Lehman" where the distinction between the two is irrelevant.

Lehman claims that the four loans it purchased from Arlington contained various errors and misrepresentations. In 2007, Arlington acknowledged misrepresentations in the Pimentel and Steinhouse loans, and signed Indemnification Agreements with Lehman. In those Agreements, Lehman and Arlington agreed that rather than require Arlington to repurchase the loans, as required under the Loan Purchase Agreement and Seller's Guide, Lehman would keep the loans but would obligate Arlington to indemnify Lehman against all losses and damages that it may suffer on those three loans. The Indemnification Agreements also tolled the statute of limitations and provided that Arlington's indemnification obligation would remain in full force until the loan "has been paid in full, foreclosed, liquidated or otherwise retired." Lehman now claims that it never received the indemnification payments it was owed.

As to the fourth loan, the McNair loan, Lehman claims that Arlington breached the Loan Purchase Agreement and Seller's Guide, because the borrower's loan application contained material misrepresentations regarding the borrower's existing debt. The borrower represented in his loan application, dated August 21, 2006, that his debt on the property was $158,471, and that he owed monthly payments of $1,360. However, Lehman points to the borrower's refinance document, dated June 26, 2006, which shows that the borrower actually owed $328,800 on the property, with monthly payments of $2,603. Lehman argues that this is proof of a material misrepresentation in the loan

application—and thus proof that Arlington violated the Loan Purchase Agreement and the Seller's Guide.

In early 2008, Arlington and Gateway entered into an Asset Purchase Agreement, under which Gateway agreed to "purchase, acquire and take possession of all of [Arlington's] right, title and interest in and to the personal, tangible, intangible and other properties, rights and assets used in the operation of or held for use or useable in the Business." Declaration of Matthew Spohn ("Spohn Decl."), Ex. F § 2.01. Under the Asset Purchase Agreement, Gateway assumed certain specified liabilities of Arlington, including among other debts a loan and a line of credit from Wilmington Trust, all accounts payable, and all accrued payroll. *Id*. at § 2.03(a). The Asset Purchase Agreement excluded all liabilities not specifically listed, including "claims for indemnification, repurchase or make-whole by Morgan Stanley, Credit Suisse, EMC or any other secondary market investor." *Id*. at §2.03(b).

In this present action, Lehman asserts three claims for relief: (i) breach of the Loan Purchase Agreement and Seller's Guide with respect to the McNair loan; (ii) breach of the express warranties in the Loan Purchase Agreement and Seller's Guide; and (iii) breach of the Indemnification Agreements with respect to the Pimentel and Steinhouse loans. The contracts Lehman is suing under were all executed between Lehman and Arlington. But Lehman has brought suit against *Gateway*, not Arlington, claiming that Gateway is a successor in interest to Arlington. Lehman contends that the transaction

between Gateway and Arlington constituted a *de facto* merger that renders Gateway liable for Arlington's debts.[3]

In its motion for summary judgment, Lehman argues that Gateway is Arlington's successor as a matter of law, that the breaches and the damages from those breaches are not in dispute, and that Gateway should therefore be held liable to Lehman. *See* Pl.'s Mot. for Summ. J. ("Lehman Motion"). In its motion for summary judgment, Gateway argues that the *de facto* merger doctrine was abolished by statute, and thus it cannot be liable for Arlington's breaches. It also claims that Lehman's suit is barred by the statute of limitations, res judicata, and the statute of frauds. *See* Def.'s Mot. for Summ. J ("Gateway Motion").

I will examine the issues raised in the two motions individually. For the reasons explained below, I deny Gateway's motion, and partially grant Lehman's motion. I find that a genuine dispute of fact exists with respect to whether a *de facto* merger occurred between Arlington and Gateway. I also find that a genuine dispute of fact exists with respect to whether Arlington breached its contracts with Lehman.

## II.     LEGAL STANDARD

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Id.*

---

[3] Although typically a company that buys the assets of another does not become liable for the seller's obligations, Pennsylvania law imposes such liability when, among other circumstances, the transaction amounts to a *de facto* merger. *See infra* Part III-A.

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. In ruling on a motion for summary judgment, the court must draw all inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the nonmoving party may not "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claims. *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

"The rule is no different where there are cross-motions for summary judgment." *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir.2008).

> Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

*Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir.1968)). "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (1998).

In essence, the inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## III.   DISCUSSION

Lehman moves for summary judgment on the grounds that there is no dispute regarding the breach of contracts, and that Gateway is Arlington's successor-in-interest under the *de facto* merger doctrine. Gateway moves for summary judgment on the grounds that the *de facto* merger doctrine has been abolished by law, and that Lehman's suit violates the statute of limitations, res judicata, and the statute of frauds. Assuming *arguendo* that there was a breach of contract, I must determine whether Gateway is the proper defendant in this case. Therefore, I will address the *de facto* merger question first, followed by the breach of contract issue. Finally, I will address the arguments in Gateway's motion that this suit is barred by the statute of limitations, res judicata, and the statute of frauds.

### A. *De facto* Merger

Lehman moves for summary judgment, in part, on its contention that Gateway is Arlington's successor in interest under the *de facto* merger doctrine and therefore is responsible for Arlington's liabilities. Gateway moves for summary judgment, in part, on its contention that the *de facto* merger doctrine was abolished by Pennsylvania statute and that it therefore cannot be Arlington's successor in interest. As I analyze these cross motions, I will regard the facts relevant to each argument in the light most favorable to the non-moving party.

As a general rule, under Pennsylvania law,[4] "when one company sells or transfers all its assets to another, the successor company does not embrace the liabilities of the predecessor simply because it succeeded to the predecessor's assets." *Phila. Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 308 (3d Cir. 1985) (quoting *McClinton v. Rockford Punch*

---

[4] Both parties agree that Pennsylvania law controls. *See* Lehman Motion at 18; Gateway Motion at 12.

*Press & Mfg. Co.*, 549 F. Supp. 835, 837 (E.D. Pa. 1982)). There are four exceptions to

this rule:

> [W]here (1) the purchaser of assets expressly or impliedly agrees to
> assume obligations of the transferor; (2) the transaction amounts to a
> consolidation or *de facto* merger; (3) the purchasing corporation is merely
> a continuation of the transferor corporation; or (4) the transaction is
> fraudulently entered into to escape liability, a successor corporation may
> be held responsible for the debts and liabilities of its predecessor.

*Id.* at 308-09.[5] Lehman points to the second exception and argues that the Asset Purchase

Agreement between Arlington and Gateway amounted to a *de facto* merger.

Pennsylvania courts examine four factors to determine the existence of a *de facto*

merger:

> (1) There is a continuation of the enterprise of the seller corporation, so
> that there is continuity of management, personnel, physical location,
> assets, and general business operations.
> (2) There is a continuity of shareholders which results from the purchasing
> corporation paying for the acquired assets with shares of its own stock,
> this stock ultimately coming to be held by the shareholders of the seller
> corporation so that they become a constituent part of the purchasing
> corporation.
> (3) The seller corporation ceases its ordinary business operations,
> liquidates, and dissolves as soon as legally and practically possible.
> (4) The purchasing corporation assumes those obligations of the seller
> ordinarily necessary for the uninterrupted continuation of normal business
> operations of the seller corporation.

*Fizzano Bros. Concrete Prod., Inc. v. XLN, Inc.*, 42 A.3d 951, 956 (Pa. 2012). In making

this inquiry, a court must "examine the substance of the transaction to ascertain its

purpose and true intent." *Phila. Elec.*, 762 F.2d at 310 (*quoting Phila. Elec. Co. v.*

*Hercules, Inc.*, 587 F. Supp. 144, 151 (E.D. Pa. 1984)). A court "must refer not only to all

---

[5]  "A fifth circumstance, sometimes included as an exception to the general rule, is where the
transfer was without adequate consideration and provisions were not made for creditors of the
transferor." *Phila. Elec.*, 762 F.2d at 309 (quoting *Husak v. Berkel, Inc.*, 341 A.2d 174, 176 (Pa.
Super. 1975)).

the provisions of the agreement, but also to the consequences of the transaction and to the purposes of the provisions of the corporation law said to be applicable." *Fizzano Bros.*, 42 A.3d at 961-62 (*quoting Farris v. Glen Alden Corp.*, 143 A.2d 25, 28 (Pa. 1958)). Such an analysis "requires that a court look beyond the superficial formalities of a transaction in order to examine the transactional realities and their consequences." *Id* at 968. A *de facto* merger "will always be subject to the fact-specific nature of the particular underlying corporate realities and will not always be evident from the formalities of the proximal corporate transaction." *Id* at 969.

> Finally, the elements of the *de facto* merger are not a mechanically-applied checklist, but a map to guide a reviewing court to a determination that, under the facts established, for all intents and purposes, a merger has or has not occurred between two or more corporations, although not accomplished under the statutory procedure.

*Id.*

First, I will address Gateway's argument, in its motion, that the *de facto* merger doctrine has been abolished by statute. Gateway points to 15 Pa. Cons. Stat. Ann. § 1904 (1989), which states:

> The doctrine of de facto mergers, consolidations and other fundamental transactions is abolished and the rules laid down by *Bloch v. Baldwin Locomotive Works*, 75 Pa. D. & C. 24 (C.P. Del. Cty. 1950), and *Marks v. The Autocar Co.*, 153 F. Supp. 768 (E.D. Pa. 1954), and similar cases are overruled."

Gateway concedes that there is no relevant state case statute applying the law to the context before me. Gateway Motion at 16. Indeed, since 1989, when the law went into effect, the Pennsylvania courts have routinely applied the *de facto* merger; the Pennsylvania Supreme Court issued a lengthy opinion explaining its contours just last year. *Fizzano Bros.*, 42 A.3d 951. As a federal court sitting in diversity, I am bound to

apply the state law as interpreted by the state's highest court.[6] *Fed. Home Loan Mortgage Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 443 (3d Cir. 2003). As such I will follow the Pennsylvania Supreme Court and continue to apply the *de facto* merger doctrine.

Lehman moves for summary judgment on the question of *de facto* merger, asserting that it has demonstrated all four factors and that Gateway is Arlington's successor in interest as a matter of law. Lehman Motion at 18-28. In its response, Gateway makes two separate arguments. First, it claims that because the Asset Purchase Agreement specifically stipulated that Gateway would *not* be liable for "claims for indemnification, repurchase or make-whole by . . . any other secondary market investor," Gateway cannot be liable for Arlington's obligations to Lehman. Second, it argues that there was no "continuity of ownership" between Arlington and Gateway, and thus no *de facto* merger.

As to its first argument, Gateway relies on *SmithKline Beecham Corp. v. Rohm & Haas Co.*, 89 F.3d 154 (3d Cir. 1996). The complicated facts of the case require a somewhat detailed explanation. A company referred to in the suit as "Old Whitmoyer" was responsible for pollution contamination of an area that eventually became a Superfund site. Old Whitmoyer sold its assets to a subsidiary of Defendant Rohm and Haas ("R & H") in 1964, though R & H did not know of the contamination. The subsidiary became "New Whitmoyer". In 1978, R & H sold Plaintiff SmithKline Beecham ("SKB") all of the stock of New Whitmoyer, among other assets. In the

---

[6] Lehman interprets the law as applying only to dissenting shareholder rights. Indeed, the two cases cited in the statute centered on shareholder rights. It has been cited very rarely, and only once by the Third Circuit, in the context of shareholder rights. *See MicroSignal Corp. v. MicroSignal Corp.* 147 Fed. Appx. 227 (3d Cir. 2005). Given the Pennsylvania courts' continued application of the *de facto* merger doctrine since 1989 to facts similar to those at issue here, most recently by the state supreme court last year, Lehman's interpretation is a reasonable one.

purchase agreement, R & H indemnified SKB against "all material liabilities relating to the conduct of the Business prior to the First Closing Date." *Id*. at 157. SKB agreed to indemnify R & H for all losses and liabilities "resulting from the operation of the Business by the Buyer after the First Closing Date." *Id.* Later, SKB and R & H entered into a consent judgment with the United States under the Comprehensive Environmental Response, Compensation, and Liability Act relating to the Superfund site. SKB then sued R & H seeking an equitable apportionment of clean-up costs and enforcement of the indemnity provisions of the purchase agreement. The district court held that R & H was liable to SKB for clean-up of wastes dumped when New Whitmoyer was an R & H subsidiary, based on the indemnification agreement between R & H and SKB. It further found that a *de facto* merger had occurred between Old Whitmoyer and New Whitmoyer, making New Whitmoyer liable for Old Whitmoyer's debts. Therefore, R & H was required to indemnify SKB for all of New Whitmoyer's liabilities—including successor liability for Old Whitmoyer's conduct.

On appeal, R & H argued that the *de facto* merger doctrine should not be used to alter the scope of the indemnification clause it entered into with SKB: SKB and R & H never specifically allocated Old Whitmoyer's liabilities in the indemnification agreement, and so the *de facto* merger doctrine should not be used to hold it responsible for Old Whitmoyer's conduct.

The Third Circuit agreed. SKB and R & H "drafted an indemnification provision that excluded successor liability." *Id*. at 163. The parties chose to limit the definition of "Business" in that provision to New Whitmoyer only. The court thus held:

> Under these circumstances, we believe it was not appropriate for the district court to apply the *de facto* merger doctrine to alter the effect of the

> indemnification provision. . . . [W]here two sophisticated corporations
> drafted an indemnification provision that excluded the liabilities of a
> predecessor corporation, we will not use the *de facto* merger doctrine to
> circumvent the parties' objective intent.

*Id*.

Gateway argues that because the Asset Purchase Agreement between Arlington and Gateway specifically excluded liabilities from "secondary market investor[s]" like Lehman, I should follow the Third Circuit and refuse to find a *de facto* merger that would render Gateway responsible for Arlington's liabilities.

This argument is unavailing for two reasons. First, I am bound to follow the Pennsylvania Supreme Court's interpretation of Pennsylvania law, which just last year reemphasized that *de facto* mergers may be found between two sophisticated corporations. *Fizzano Bros.*, 42 A.3d 951. Second, the Third Circuit in rendering its decision in *SmithKline Beecham* emphasized the purpose of the *de facto* merger doctrine: It is a way to avoid "the patent injustice which might befall a party simply because a merger has been called something else." *SmithKline Beecham*, 89 F.3d at 164 (*quoting In re Penn Cent. Sec. Litig.*, 367 F. Supp. 1158, 1170 (E.D. Pa. 1973)). The court called the doctrine "a judicial creation to protect a particular class of plaintiffs from the consequences of a transaction over which they have no control." *Id*. Those policy considerations were not at issue in SKB's battle with R & H: Both SKB and R & H, the parties to the suit, had full control over the indemnification contract between them, and thus "there is no third party whose interests have been impaired by forces beyond their control." *Id*. The same cannot be said about the case before me. Lehman had no control over the Asset Purchase Agreement between Gateway and Arlington. Indeed, Lehman in this case is precisely the sort of third party that the *de facto* merger doctrine is meant to

protect: Without the doctrine, Arlington could escape all liability to Lehman simply by selling its business to another party. The purported exclusion of liability in the Arlington-Gateway Asset Purchase Agreement will therefore not control my determination of whether Gateway is, in fact, liable for Arlington's obligations.

In discussing the four factors that help determine the existence of a *de facto* merger, Gateway addresses only the "continuity of ownership" prong. Its failure to contest the other three factors will be interpreted as a concession. Therefore, the only question before me is whether Lehman has demonstrated that a continuity of ownership between Arlington and Gateway existed as a matter of law, or whether there is a genuine dispute of fact as to that question that must be resolved by a fact-finder.

The Pennsylvania Supreme Court recently affirmed that "the *de facto* merger exception *requires* 'some sort of' proof of continuity of ownership or stockholder interest." *Fizzano Bros.*, 42 A.3d at 969.

> However, such proof is not restricted to mere evidence of an exchange of assets from one corporation for shares in a successor corporation. Evidence of other forms of stockholder interest in the successor corporation may suffice; indeed, 15 Pa. Cons. Stat. Ann. § 1922(a)(3) [the state law governing corporate mergers] contemplates that continuing shareholder interest pursuant to a statutory merger may take the form of 'obligations' in lieu of shares in the new or surviving corporation.

*Id.*

Lehman argues that proof of the continuity of ownership can be found in the special payments that Arlington's owners received under the Asset Purchase Agreement. The Agreement provided Arlington's four shareholders with substantial loans that would be forgiven after two years of employment with Gateway. Shareholders Daniel Leinhauser and Kevin Kenyon were each given $60,000 loans, while shareholders Philip

Russo and Joseph Granahan each received $100,000 loans. All the loans were ultimately forgiven. The loans were paid up front, at the time of closing, and thus were, in effect, cash payments. No other Arlington employee was given these loans. In addition, the four shareholders received lump-sum cash payments that had no repayment terms at all. Leinhauser received $65,000, Granahan received $140,000, Kenyon received $100,000, and Russo received $143,200. Importantly, the four shareholders never officially sold their ownership interests in Arlington. All four "still have the exact same shareholdings" as they did before the Asset Purchase Agreement.

The fact of the payments is undisputed. What is in dispute is what the payments were for. Lehman asserts that the forgivable loans and cash payments, totaling more than $760,000, constituted compensation for the Arlington shareholders' ownership interests. Therefore, the payments show a continuity of ownership under *Fizzano Bros.*

As the *Fizzano Bros.* court noted, Pennsylvania's Business Corporation Law of 1988, which sets for the elements of a statutory merger, allows owners of a predecessor corporation to "surrender their shares of stock for 'obligations' of the successor corporation, or . . . 'cash, property, or rights' in lieu of shares in the successor corporation." *Fizzano Bros.*, 42 A.3d at 968. In other words, the owners of the predecessor corporation do *not* have to exchange their shares of the predecessor company for shares of the successor corporation; the successor can pay them with cash, property, or other rights instead. This suggests that the cash payments to Arlington's owners—if they were in fact payments in exchange for the Arlington owners' shares in Arlington— would have been sufficient to effectuate a statutory merger under the Business

Corporation Law. The *Fizzano Bros.* court extrapolated that a *de facto* merger could similarly be shown by the exchange of shares for cash, not just shares for shares:

> Because the Corporation Law does not **always** require an exchange of shares, for a statutory merger . . . , it would be incongruous to adopt a blanket rule that a *de facto* merger **would always** require a rigid showing that the shareholders of the predecessor corporation have exchanged their ownership interests for shares of the successor corporation.

*Fizzano Bros.*, 42 A.3d at 968.

The *Fizzano Bros.* court held that the "continuity of ownership prong of the *de facto* merger analysis certainly may not be more restrictive than the relevant elements of a statutory merger as contemplated by our legislature." *Id.* Therefore, since cash payments for Arlington shares would suffice to effectuate a *statutory* merger, Lehman argues that the cash payments are sufficient to demonstrate the continuity of ownership required to prove a *de facto* merger.

There is certainly some evidence that the payments were in exchange for the Arlington shareholders' ownership interests. Leinhauser and Granahan both testified that they understood that, after the Asset Purchase Agreement, their ownership shares in Arlington would be rendered worthless. Leinhauser Dep. 28:14-29:2; Granahan Dep. 19:3-17. Granahan explained that he expected and received compensation for his ownership shares, in the form of the lump sum cash payment and the forgivable loan. *Id.* at 19:22-20:16. When asked whether the payments received were what he thought he "deserved for giving up [his] ownership interest in Arlington," Granahan answered, "Yes." *Id.* at 33:11-14.

On the other hand, there is evidence that the payments were connected merely to the non-compete agreements and the employment contracts that all four Arlington

shareholders signed with Gateway. For one, the non-compete agreements specifically listed the cash payments and forgivable loans under the section titled "Consideration," which framed the payments as "consideration of the Stockholder's agreements herein not to compete with the Buyer." *See* Spohn Dec. Exs. I, N, P, and Y, all at ¶ 5. Additionally, the forgivable loans were contracted to in agreements that mentioned only the shareholders' employment status with Gateway, not their status as Arlington shareholders, and the agreements conditioned the forgiveness of the loan upon two years employment with Gateway. Spohn Decl. Exs. J, K, M, Q.

The parties involved all characterized the payments a bit differently. Bruno Pasceri, the President of Gateway, testified that the payments were consideration for the non-compete agreements. Pasceri Dep. 116:21-117:2. Russo testified that he understood the idea behind the forgivable loans given only to the four Arlington shareholders was to get them to "aggressively recruit and bring over as many of the people that are worth having as we could possibly bring over." Russo Dep. 106:4-8. In other words, he saw the payments as incentives rather than consideration for his ownership stake in Arlington. Leinhauser testified that, to him, the entire transaction was "basically an employment deal," and he was unaware whether he got special payments for being a stockholder. Leinhauser Dep. 18:10-14. Thus while Granahan linked the payments to the devaluation of his ownership stake in Arlington, the other shareholders did not explicitly tie the payments to their status as shareholders.

The *Fizzano* court was clear that the inquiry into *de facto* merger—and continuity of ownership in particular—is a fact-based one, meant to expose the underlying intentions behind and consequences of a given transaction. The evidence before me

shows a lack of consensus about the intention of the parties regarding the payments to the Arlington shareholders. Further, no specific evidence has been presented demonstrating the value of the four owners' Arlington shares before and after the Asset Purchase Agreement, making it difficult to assess the full consequences of the transaction.[7] As a result, there is a genuine dispute of material fact whether the Asset Purchase Agreement resulted in a continuity of ownership and, ultimately, a *de facto* merger between Arlington and Gateway. Lehman has failed to establish the existence of a *de facto* merger as a matter of law, and thus its summary judgment motion will be denied on this point.

## B. Breach of Contract

In its motion for summary judgment, Lehman argues that the breaches of contract and the ensuring damages can be found as a matter of law. Because this issue was raised in Lehman's motion, I will interpret the facts in the light most favorable to Gateway. There are four loans at issue, but one, the McNair loan, presents a separate issue than the other three and will thus be analyzed separately.

### 1. McNair Loan

Arlington sold the McNair loan to LBB in 2006. The sale was subject to Arlington's representations and warranties in the Seller's Guide, including a representation that the loan included no falsified or misleading material fact. The Seller's Guide further provided that, in the event of a breach of the representations included, Arlington would be required to buy back the loan from Lehman.

---

[7] The owners have testified only that, to the best of their knowledge, the stock no longer has value. Leinhauser Dep. 28:14-29:2; Granahan Dep. 19:3-17; Kenyon Dep. 34:18-23. Russo testified that he has never had his ownership interest in Arlington valued. Russo Dep. 61:20-62:4.

Lehman asserts that the McNair loan contained material misrepresentations, in breach of the agreement. Specifically, in the loan application with Arlington, which was transmitted to Lehman in connection with the sale of the loan, the borrower represented that his/her debt on the property was $158,471, owing monthly payments of $1,360. That application is dated August 21, 2006. However, Lehman asserts that the borrower in fact had almost twice as much debt. It points to a refinance document, dated June 26, 2006, that shows that the borrower actually owed $328,800 on the property, with monthly payments of $2,603. This misrepresentation, Lehman argues, was material and had an adverse effect on the value of the loan and Lehman's interests.

Drawing all reasonable inferences in favor of Gateway, I find that the existence of a material misrepresentation on the McNair loan is a genuine dispute of fact that must be resolved by a fact-finder. Lehman has not proven that the borrower did not in fact pay down a substantial portion of his/her loan between June and August, which would account for the reduced debt level indicated on the loan application. Lehman argues that Gateway has failed to show that such payments actually occurred, but it is *Lehman*'s burden, in a motion for summary judgment, to prove that there is no issue of material fact; it is *Lehman's* burden to prove that the Arlington application, in fact, included material misrepresentations. While it may seem unlikely that the borrower paid down such a large chunk of his mortgage in two months, it is certainly not impossible. At this stage, I may not draw the reasonable inference that the McNair loan contained a

misrepresentation—but a jury, after assessing all the facts, would be permitted to draw such an inference.[8] Therefore, the question must go to the fact-finder.

### 2. Pimentel and Steinhouse Loans

Arlington sold the Pimentel and Steinhouse loans to LBB in 2006. On May 17, 2007, Arlington and Lehman[9] executed two Indemnification Agreements, covering the two Pimentel loans and the Steinhouse loan, in which Arlington acknowledged misrepresentations in the loans that were sold to Lehman.[10] The Indemnification Agreements stated that, in consideration of Lehman's forbearance from exercising its right to have Arlington immediately repurchase the loans, Arlington agreed to indemnify Lehman against all losses, damages, and claims that Lehman may have or may thereafter incur. The Agreements specified that Arlington must provide such indemnification payment within 30 days of a written demand. On May 9, 2011, Lehman's agent Aurora demanded that Arlington provide Lehman with indemnity for its losses on the Pimentel and Steinhouse loans.[11] Arlington did not indemnify Lehman for its losses on the Pimentel and Steinhouse loans within 30 days.

---

[8] Of course, such an inference would have to be reasonable and not based on mere speculation. *See, e.g.*, *Venzie Corp. v. U.S. Mineral Prods., Inc.*, 521 F.2d 1309, 1312 (3d Cir. 1975) (Plaintiff has burden to adduce sufficient evidence of its claims such that a jury could find for it "on the basis of reasonable inferences and not mere speculation").

[9] The agreements were executed between Arlington and LBB, but were validly assigned to LBHI.

[10] The Pimentel loans contained an alleged early payment default, and the Steinhouse loan contained a first payment default.

[11] Gateway disputes that Arlington received the demand letter, noting that it was mailed to Arlington's Bensalem office, which Arlington had vacated by that point. Therefore, Gateway claims, "there is no way of knowing" if Arlington received the notice, rendering the demand "defective." Def.'s Opp'n Br. ¶ 14. However, the most recent Loan Purchase Agreement between LBB and Arlington stipulated that notices were to be sent to the Bensalem address. Further, the

Gateway does not contest that Arlington breached the Indemnification Agreements by failing to indemnify Lehman.[12] Gateway raises no real dispute as to the amount of damages on these loans, calculated according to the formula specified in the Seller's Guide. Its sole argument against liability, which it raises in its own summary judgment motion, is that the action is barred by the statute of limitations. I address—and reject—that argument in Section C, below.

Gateway's only real quibble with Lehman's damages calculations relates to prejudgment interest. Gateway argues that Lehman's addition of prejudgment interest, permitted under New York law, is improper because the Loan Purchase Agreements state that federal law preempts New York law, and that the liquidations toll any prejudgment interest. Def.'s Opp'n Br. ¶ 17. It provides no authority or any legal analysis to support these claims.

The issue of prejudgment interest is governed by Pennsylvania law, as stated in the indemnification agreement.[13] Under Pennsylvania law, "in contract cases, prejudgment interest is

_____

demand letter was also mailed to Gateway itself, where Russo and Kenyon, Arlington's former CEO and President, were then employed.

[12] In its briefing, Gateway argued that the indemnification obligation was extinguished when the loans were liquidated, pursuant to Section 3 of the Indemnification Agreements. Section 3 states: "The indemnification provided under Section 1 of this Agreement shall remain in full force and effect and shall survive until either the Mortgage Loan has been paid in full, foreclosed, liquidated, or otherwise retired . . . " However, Gateway abandoned this argument during oral argument held telephonically on April 24, 2013, and so I will not address it here.

[13] Lehman asserts that New York law governs, but provides no explanation for why that would be. The Third Circuit has predicted that the Pennsylvania Supreme Court would deem the issue of prejudgment interest substantive rather than procedural. *Travelers Cas. And Sur. Co. v. Insurance Co. of North America*, 609 F.3d 143, 171 (3d Cir. 2010). Where the parties have explicitly chosen particular law to govern a contract dispute, it controls under Pennsylvania's choice-of-law rules absent a compelling reason to the contrary. *Assicurazioni Generali, S.P.A. v. Clover*, 195 F.3d 161, 164 (3d Cir. 1999).

awardable as of right." *Thomas H. Ross, Inc. v. Seigfreid*, 592 A.2d 1353, 1359 (Pa. Super. 1991). "In claims that arise out of a contractual right, interest has been allowed at the legal rate from the date that payment was wrongfully withheld, where the damages are liquidated and certain, and the interest is readily ascertainable through computation." *Daset Min. Corp. v. Indus. Fuels Corp*., 473 A.2d 584, 595 (Pa. Super. 1984). Interest must be awarded notwithstanding the good faith of the party contesting the claim. *Metro. Edison Co. v. Old Home Manor, Inc*., 482 A.2d 1062, 1064 (Pa. Super. 1984). Pennsylvania law sets interest by statute at 6 percent. 41 Pa. Stat. Ann. § 202.

I find as a matter of law that Arlington breached its duty to Lehman by failing to indemnify Lehman for its losses on the Pimentel and Steinhouse loans within 30 days of demand. Following the formula established in the Seller's Guide, Lehman calculates the losses it incurred as follows:[14]

| Loan | Total Loss Before Prejudgment Interest |
|------|----------------------------------------|
| Pimentel (#2680) | $67,143.68 |
| Pimentel (#2672) | $163.869.76 |
| Steinhouse (#2995) | $217,519.64 |

---

While the original Loan Purchase Agreements stated that New York law would govern, the Indemnification Agreements clearly state that Pennsylvania law governs. Because the issue on which Plaintiff is seeking judgment, and thus prejudgment interest, is breach of the Indemnification Agreements, and not the Loan Purchase Agreements, I will apply Pennsylvania law.

[14] *See* Baker Decl. ¶24-37 & Ex. M.

These amounts reflect the amount of loss of which Lehman informed Arlington in its demand letter of May 9, 2011. Baker Decl. Ex. I. They are found as a matter of law, in addition to prejudgment interest at Pennsylvania's rate of 6 percent.[15]

Therefore, Lehman is granted summary judgment on the question of breach of contract with respect to the Pimentel and Steinhouse loans. However, Gateway will only be liable for that breach if the fact-finder determines that Gateway is Arlington's successor in interest under the *de facto* merger doctrine.

## C. Statute of Limitations

Turning to Gateway's motion, it moves for summary judgment on the contention that Lehman's claims with respect to the Pimentel and Steinhouse loans are barred by the statute of limitations. As there are no outstanding disputes as to the facts, I will rule based upon the law. Section 12 of the Indemnification Agreements specified that their provisions were to be construed according to Pennsylvania law, and Section 8 tolled the statute of limitations:

> Statute of Limitations. In consideration for allowing the Seller [Arlington] to enter into this Agreement rather than repurchase the Mortgage Loan(s), the statute of limitations (and other defenses passed upon the passage of time) as to any and all claims known or unknown, that LBB and/or Aurora may have against the seller are hereby tolled as they relate to the Mortgage Loan(s).

Gateway argues that Pennsylvania's four-year statute of limitations for contract disputes governs these Agreements, despite the language in the agreements purporting to toll the limitations period. Although Gateway cites cases that generally explain the importance of statutes of limitations, it fails to present any specific Pennsylvania authority showing that parties to a contract may not waive statutes of limitations. To the contrary, the Pennsylvania Supreme Court

---

[15] Lehman incorrectly applied New York law in calculating its prejudgment interest. Pennsylvania law sets prejudgment interest at 6 percent per annum, rather than the 9 percet given under New York law.

has endorsed parties' authority to modify limitations periods: "It is true, of course, that parties to a lawsuit or a potential lawsuit may modify the statutory period of limitation." *Ins. Co. of N. Am. v. Carnahan*, 284 A.2d 728, 729 (Pa. 1971).

Indeed, the structure of Pennsylvania's limitations laws suggests that the legislature contemplated such contractual extensions. The relevant statutory language, 42 Pa. Cons. Stat. Ann. § 5525, states a "general rule" that actions upon a contract must be commenced within four years. Notably, 13 Pa. Cons. Stat. Ann. § 2725, which incorporates the Universal Commercial Code and governs disputes of contracts for sale of goods, specifically states that parties may *shorten* the four-year limitations period "but may not extend it." The absence of such a proscription in the statute governing non-sale contracts—including indemnification agreements—provides further evidence that contractual extensions of the limitations period is permitted.[16]

Further, even if the four-year bar applied and I ignored § 8 of the Indemnification Agreements, Lehman's claims fall within the statutory period. Gateway argues that Lehman's claims accrued at the date of the signing of the Indemnification Agreements—May 17, 2007—because the breach had already occurred on that date. Gateway Motion at 23-24. Thus, according to Gateway, Lehman's September 28, 2011 filing falls outside the statutory window. But on these loans, Lehman is not suing for breach of the Loan Purchase Agreement and Seller's Guide; it is suing for breach of the Indemnification Agreements. Gateway's novel reading of the indemnification contract would nullify the entire purpose of such a contract. Lehman's claim did not accrue at the time of signing the contract. Rather, the claim accrued at the time of Arlington's

---

[16] Other courts have taken this view. *See, e.g., Hunter-Boykin v. George Washington Univ.*, 132 F.3d 77, 79 (D.C. Cir. 1998) (citing 54 C.J.S. Limitations of Actions § 25, at 56 (1987)) ("The usual rule is that 'in the absence of a controlling statute *to the contrary*, the parties to a ... potential lawsuit may, by agreement, modify a statutory period of limitation.'").

failure to *perform* the contract: when it failed to indemnify Lehman within 30 days of Lehman's demand. Lehman avers that it made its demand upon Arlington on May 9, 2011. After receiving no indemnification, it filed this suit in September, well within the law's four-year time period. Gateway's motion for summary judgment on statute of limitations grounds is denied.

### D. Res Judicata

Gateway next raises the affirmative defense that res judicata bars Lehman from bringing this suit. Again, *res judicata* is an issue of law and will be ruled upon as such. Gateway's argument is based on the fact that Aurora, Lehman's agent, sued Gateway in 2007 for Gateway's failure to repurchase certain loans or indemnify Aurora against losses resulting from such failure.[17] That complaint was amended in March 2008, one month after the Asset Purchase Agreement between Gateway and Arlington; as a result, under Lehman's theory of *de facto* merger liability, Gateway argues, Lehman should have brought all of its claims against Arlington together with its claims against Gateway in the 2007 suit, since they became one and the same company.

The 2007 suit involved loans that Gateway sold directly to Aurora, Lehman's agent, pursuant to a loan purchase agreement and seller's guide.[18] Aurora alleged that Gateway had breached representations, warranties, and/or covenants in the loan purchase agreement and seller's guide. The loan purchase agreement and seller's guide provided that, in the event of a breach, Aurora could require Gateway to repurchase the loan in question. After making such

---

[17] That prior suit was filed by Aurora Loan Services, not Lehman, against Gateway for breach of Gateway's, not Arlington's, Loan Purchase Agreement with regard to loans that Gateway, not Arlington, sold to Aurora. *Aurora Loan Services LLC v. Gateway Funding Diversified Mortgage Services, L.P.,* No. 07-cv-5149 (E.D. Pa. March 5, 2008).

[18] The loan purchase agreement and seller's guide at issue in the 2007 suit were not attached to that complaint, nor included as exhibits in Gateway's motion for summary judgment before me. Therefore, I do not know whether those agreements were similar to the loan purchase agreement and Seller's Guide that Lehman entered into with Arlington.

demand, Gateway refused to repurchase the loans at issue, leading to Aurora's suit. The case

settled, and the suit was dismissed with prejudice. Gateway argues that *res judicata* therefore

serves as a bar to the present litigation.

Under Pennsylvania law, *res judicata*, also known as claim preclusion, bars a subsequent

litigation only when the two actions share an identity of the (1) thing sued on; (2) cause of

action; (3) persons and parties to the action; and (4) capacity of the parties to sue or be sued.

*O'Leary v. Liberty Mt. Ins. Co.*, 923 F.2d 1062, 1065 (3d Cir. 1991) (citing *McNasby v. Crown*

*Cork & Seal Co., Inc.,* 888 F.2d 270, 276 (3d Cir. 1989)).  The 2007 suit involved entirely

different loans than the four that form the basis of the action before me. Therefore, it cannot be

said that the "thing sued on" is the same.

In addition, Gateway has failed to show that the cause of action is the present suit and the

2007 suit are the same. "There is no bright-line test for determining when the cause of action in

two suits are identical for res judicata purposes," *O'Leary,* 923 F.2d at 1065, but the Third

Circuit has identified several factors relevant to the inquiry, including:

> (1) whether the acts complained of and the demand for relief are the same (that is,
> whether the wrong for which redress is sought is the same in both actions); (2)
> whether the theory of recovery is the same; (3) whether the witnesses and
> documents necessary at trial are the same (that is, whether the same evidence
> necessary to maintain the second action would have been sufficient to support the
> first); and (4) whether the material facts alleged are the same.

*Id.* (citing *United States v. Athlone Indus., Inc*., 746 F.2d 977, 984 (3d Cir.1984)). While the

2007 suit was based on breaches of the loan purchase agreement and seller's guide, the suit

before me, at least with respect to the Pimentel and Steinhouse loans, centers on breaches of

indemnification agreements. Therefore, the wrong for which redress is sought is not the same,

nor is the theory of recovery the same. Because the two suits involve entirely different loans, the

documents necessary at trial would not be the same, nor would the material facts alleged be the same. The present suit is not barred by *res judicata*.[19]

### E. Statute of Frauds

Finally, Gateway moves for summary judgment on the allegation that, because there was no written agreement between itself and Lehman, the statute of frauds bars contractual liability. This argument fails if it is determined that Gateway is a successor to Arlington under the *de facto* merger doctrine. If the jury finds the existence of a *de facto* merger, then by definition Gateway assumes Arlington's written liabilities. There is no dispute that a written contract existed between Arlington and Lehman, and therefore there is no statute of frauds problem, assuming that Gateway is found to be Arlington's successor in interest.[20] Because Gateway would only be liable to Lehman as Arlington's successor in interest, there is no statute of frauds problem.

### B. CONCLUSION

There is a genuine dispute of fact whether the transaction between Gateway and Arlington effected a continuity of ownership and thus constituted a *de facto* merger. There is also

---

[19] Gateway's argument sounds more like a claim about joinder than *res judicata*. It argues that if there had been a *de facto* merger between Arlington and Gateway in 2008, the plaintiff in the earlier suit "should have included the four [Arlington] loans from *this* lawsuit into the *prior* lawsuit against Gateway Funding before the lawsuit was settled in 2009." Gateway Motion at 22. Of course, under the Federal Rules of Civil Procedure, joinder of claims is permitted, but not mandatory. Fed. R. C. P. 18. Pennsylvania requires joinder of claims that arise out of the same transaction. Pa. R. C. P. 1020. However, "[w]here the evidence that would establish one complaint is distinct from the evidence that would establish the other complaint, the complaints do not arise from the same transaction or occurrence." *Hineline v. Stroudsburg Elec. Supply Co., Inc.*, 586 A.2d 455, 457 (1991). As explained above, the evidence required to prove Aurora's breach of contract claims against Gateway in the 2007 suit is different from the evidence needed for Lehman to prove its breach of contract claims against Arlington in the present action. Therefore, these claims would not have arisen under Pennsylvania's mandatory joinder rule. Regardless, Gateway's argument is based on *res judicata*, not joinder.

[20] As Lehman points out, Gateway's argument would effectively end the *de facto* merger doctrine, which by definition is premised on the lack of a written contract under which the successor assumed the liabilities of the predecessor.

a genuine dispute of fact whether the McNair loan contained material misrepresentations that would render Arlington in breach of the Loan Purchase Agreement and Seller's Guide. On those points, Lehman's motion for summary judgment is denied. However, there is no question of fact regarding the breach of the indemnification agreements, and the damages owed, with respect to the Pimentel and Steinhouse loans. Therefore, I grant Lehman's motion with respect to the breach of contract claims relating to those loans. I deny Gateway's motion with respect to its statute of limitations, *res judicata*, and statute of frauds arguments. I also deny Gateway's motion with respect to its claim that the *de facto* merger doctrine has been abolished by statute.

s/Anita B. Brody

_____

ANITA B. BRODY, J.